# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| Penelope J. Skipper, | : | Case No. 3:12 CV 2005 |
| | : | |
| Plaintiff, | **:** | |
| | **:** | |
| v. | : | |
| | : | |
| Commissioner of Social Security**,** | **:** | **REPORT AND** |
| Defendant, | **:** | **RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Penelope J. Skipper ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 12 and 15). For the reasons that follow, the Magistrate recommends that the decision of the Commissioner be affirmed.

## II. PROCEDURAL BACKGROUND

1

On February 4, 2010, Plaintiff filed an application for a period of DIB under Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 10, p. 132 of 379). On that same day,

Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381

(Docket No. 10, p. 136 of 379). In her application, Plaintiff alleged a period of disability beginning

January 1, 2009 (Docket No. 10, pp. 132, 136 of 379). Plaintiff's claims were denied initially on May

28, 2010 (Docket No. 10, p. 66 of 379), and upon reconsideration on October 12, 2010 (Docket No.

10, pp. 74, 76 of 379). Plaintiff thereafter filed a timely written request for a hearing on November 12,

2010 (Docket No. 10, p. 78 of 379).

On September 8, 2011, Plaintiff appeared with counsel for a hearing before Administrative

Law Judge Regina L. Warren ("ALJ Warren") (Docket No. 10, pp. 30-58 of 379). Also appearing at

the hearing was an impartial Vocational Expert ("VE") (Docket No. 10, pp. 51-58 of 379). ALJ

Warren found Plaintiff to have a severe combination of pulmonary insufficiency, hypertension, chronic

obstructive pulmonary disease ("COPD"),[1] restless leg syndrome ("RLS"),[2] obesity, headaches,

personality disorder, post-traumatic stress disorder ("PTSD") with anxiety, and depression with an

onset date of January 1, 2009 (Docket No. 10, p. 16 of 379).

Despite these limitations, ALJ Warren determined, based on all the evidence presented, that

Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

alleged onset date through September 23, 2011, the date of her decision (Docket No. 10, p. 24 of 379).

---

[1] Any of a group of debilitating, progressive, and potentially fatal lung diseases that have in common increased resistance to air movement, prolongation of the expiratory phase of respiration, and loss of the normal elasticity of the lung. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

[2] A condition of unknown cause marked by an intolerable creeping sensation or itching in the lower extremities and causing an almost irresistible urge to move the legs. The symptoms are worse at the end of the day when the patient is seated or in bed and may produce insomnia. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

ALJ Warren found Plaintiff had the residual functional capacity to perform light work with the following limitations:

1.   Plaintiff may only occasionally climb stairs, but no ladders

2.   Plaintiff may frequently balance, stoop, kneel, crouch, and crawl

3.   Plaintiff must avoid exposure to extreme heat/cold, wetness, humidity, fumes, dust, gases, odors, chemicals, hazardous machinery, and unprotected heights

4.   Plaintiff is capable of single, repetitive tasks without special supervision

5.   Plaintiff can attend work regularly and accept supervisory feedback

6.   Plaintiff is capable of performing simple tasks for at least two-hour periods of time

7.   Plaintiff is expected to occasionally miss a day of work secondary to her symptoms

8.   Plaintiff is best suited for a job which does not require continuous interaction with the general public

(Docket No. 10, p. 19 of 379). Plaintiff's request for benefits was therefore denied (Docket No. 10, p. 24 of 379).

On August 3, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged that: (1) the ALJ's determination of Plaintiff's mental residual functional capacity was not supported by substantial evidence; and (2) the ALJ failed to follow the treating physician rule with regard to Plaintiff's medical records provided by Health Care Partners of South Carolina (Docket No. 12). Defendant filed its Answer on October 18, 2012 (Docket No. 9).

## III.  FACTUAL BACKGROUND

A. **ADMINISTRATIVE HEARING**

An administrative hearing convened on September 8, 2011, with ALJ Warren presiding by video from North Charleston, South Carolina (Docket No. 10, pp. 14, 30-58 of 379). Plaintiff, represented by counsel Jenna Able, appeared and testified from Myrtle Beach, South Carolina (Docket No. 10, pp. 35-51 of 379). Also present and testifying was VE Dr. Mark Stednicki ("Dr. Stednicki") (Docket No. 10, p. 51-58 of 379).

1. **PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was a forty-eight-year-old divorced mother of two who resided with her children, ages eight and nine, and her sister (Docket No. 10, p. 36 of 379). Plaintiff testified that she graduated from high school (Docket No. 10, p. 36 of 379). When asked why she could not work, Plaintiff indicated that she suffered from both physical and mental problems (Docket No. 10, p. 50 of 379). Plaintiff stated that she last worked as a Certified Nurse's Assistant but stopped in early 2009  when her family moved to South Carolina and she became depressed (Docket No. 10, pp. 35, 37 of 379).

Plaintiff gave testimony concerning a number of her alleged impairments, including COPD/asthma, knee issues, RLS, chronic headaches, and depression. With regard to her COPD and asthma, Plaintiff testified that she has a hard time breathing, often wheezing and "always huffing and puffing" (Docket No. 10, p. 38 of 379). She becomes out of breath just walking from a parking lot into a store and has to sit down to regain her breath (Docket No. 10, p. 38 of 379). Plaintiff admitted that she is a long-time smoker, but stated that she has decreased her consumption from two packs of cigarettes per day to one-half pack per day (Docket No. 10, p. 37 of 379). When asked, Plaintiff stated that she did not believe that her smoking contributed to her COPD or asthma problems (Docket No. 10,

pp. 37-38 of 379). Plaintiff indicated that, aside from some wheezing, her symptoms were mostly controlled through medication (Docket No. 10, pp. 48-49 of 379).

With regard to her knee issues, Plaintiff stated that she walks with a cane because her left knee sometimes gives out (Docket No. 10, p. 39 of 379). She uses the cane for both long and short distances, and any time she walks over uneven ground (Docket No. 10, p. 44 of 379). Plaintiff indicated that she uses a cane most of the time, although more often when she is outside and there is no furniture to hold on to (Docket No. 10, p. 39 fo 379). Walking increases her pain, but if she sits, Plaintiff testified that she has to keep moving her legs because of the RLS (Docket No. 10, p. 40 of 379). Plaintiff indicated that she gets relief from her medication and from constantly moving her legs (Docket No. 10, p. 40 of 379).

When asked about her RLS, Plaintiff stated that her pain is severe, and described it as a "nagging" pain (Docket No. 10, p. 44 of 379). Plaintiff testified that she suffers from RLS "pretty much all the time," even during the day, but her pain is slightly alleviated if she gets up and down and moves her legs (Docket No. 10, p. 44 of 379). Plaintiff indicated that medication helps manage her symptoms (Docket No. 10, p. 49 of 379).

Plaintiff testified that she has headaches one to two times per week, which typically last three hours (Docket No. 10, pp. 48, 50 of 379). She indicated that she must lay down and close her eyes during these headaches and cannot go about her regular daily activities (Docket No. 10, p. 50 of 379). Plaintiff stated that she started a new headache medication the day before the hearing (Docket No. 10, p. 48 of 379). Plaintiff also indicated that she suffers from depression two to three days per week and will just sit and cry (Docket No. 10, p. 47 of 379).

With regard to her residual functional capacity, Plaintiff testified that she could only walk

halfway to the end of her street and back without resting (Docket No. 10, p. 40 of 379). She can sit for

thirty to sixty minutes before needing to stand up (Docket No. 10, p. 40 of 379). Plaintiff estimated

that she sat for four to five hours during the day (Docket No. 10, p. 41 of 379). Plaintiff is able to touch

her knees, but not her toes, lift her arms over her head, climb a minimal amount of stairs, hold a cup

and drink, use a knife and fork, and take items out of her kitchen cabinets (Docket No. 10, pp. 43, 45-

47 of 379). Plaintiff also testified that she is able to take care of her own personal hygiene needs, get

dressed by herself, get in and out of the shower on her own, and do the laundry, as long as she sits

down to fold the clothes (Docket No. 10, pp. 46-47 of 379). Plaintiff stated that she cannot kneel,

crouch, clean the house, or drive (Docket No. 10, pp. 43, 47 of 379). She does not cook unless her

children are home (Docket No. 10, p. 46 of 379). Plaintiff indicated that she does not belong to any

organization, participate in any extracurricular activities, or go to church (Docket No. 10, p. 51 of

379). She did state, however, that she crochets for about an hour each day (Docket No. 10, p. 51 of

379). Plaintiff admitted that she was overweight, but stated that she lost forty pounds after her doctor

told her to go on a diet, bringing her weight down to 250 pounds (Docket No. 10, p. 38 of 379).

## 2.  VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the

hearing, the VE described Plaintiff's past work as a Certified Nurse's Assistant as medium and semi-

skilled and as a stocker/store laborer as medium and unskilled (Docket No. 10, pp. 52-53 of 379).

ALJ Warren then posed her first hypothetical question:

Assume a person the claimant's age, education, work experience, who is able to perform
light work as that is defined in the regulations . . . Light exertional level, the individual
could occasionally climb stairs, should not climb ladders. Could occasionally balance,
could occasionally stoop, occasionally kneel, occasionally crouch and occasionally crawl.
The individual should avoid extreme heat, cold, wetness, humidity, fumes, dust, gas, odors
and chemicals and should avoid hazardous machinery and unprotected heights. The

individual is capable of single reaching repetitive tasks and does not require any special supervision. The individual would be able to attend work regularly and accept supervisory feedback. The individual is capable of performing those simple tasks for at least two hour periods of time throughout the day. The individual might miss an occasional day of work secondary to the symptoms and would be best suited for a position which does not require any continuous interaction with the public. Can an individual with these limitations perform any of the past work of the claimant as it was performed or as customarily performed?

(Docket No. 10, pp. 53-54 of 379). Taking into account these limitations, the VE testified that such an individual would not be able to perform Plaintiff's past work (Docket No. 10, p. 54 of 379). The VE stated that there was other light work that the hypothetical person could perform, including: (1) office helper, listed under DOT 239.567-010, for which there are 224,000 positions nationally and 2,800 locally; (2) inspector/hand packer, listed under DOT 559.687-074, for which there are 126,000 positions nationally and 3,000 locally; and (3) order caller, listed under DOT 209.667-014, for which there are 214,000 positions nationally and 3,000 locally (Docket No. 10, pp. 54-55 of 379).

ALJ Warren then posed a second hypothetical question:

Assume a person the claimant's age, education, and work experience who could perform sedentary work, as sedentary is defined in the regulations. The same limitations would apply as in hypothetical one . . . Could an individual with these limitations perform any of the past work that the claimant performed customarily or as it was performed regularly?

(Docket No. 10, p. 55 of 379). Taking into account these limitations, the VE testified that such an individual would not be able to perform Plaintiff's past work (Docket No. 10, p. 55 of 379). The VE stated that there was other work that the hypothetical person could perform, including: (1) document preparer, listed under DOT 249.587-018, for which there are 96,000 positions nationally and 1,200 locally; (2) weight tester, listed under DOT 539.485-010, for which there are 13,000 positions nationally and 315 locally; and (3) fishing reel assembler, listed under DOT 732.684-062, for which there are 28,000 positions nationally and 565 locally (Docket No. 10, pp. 55-56 of 379).

7

Finally, ALJ Warren posed her third hypothetical question:

Sedentary exertional level, same limitations that apply in hypothetical two . . . but I'm adding the additional limitation that the individual would be off task greater than one third of the time due to sickness. Could that individual with these limitations perform any of the past work of the claimant, as it was performed or as customarily performed?

(Docket No. 10, p. 56 of 379). The VE indicated that, given these limitations, such an individual would neither be able to return to Plaintiff's past work or engage in any other work in the national economy (Docket No. 10, p. 56 of 379).

On cross examination, Plaintiff's counsel posed her own hypothetical:

Assuming the same individual and further assume that due to depression, this person and their limitations would include: Thought process would be slowed. The thought content appropriate, however the mood is depressed. Attention and concentration is poor. Her memory is adequate. And the work related limitations would be considered to be serious due to her depression. With these limitations, what kind of impact, if any, would that have on the job base?

(Docket No. 10, p. 57 of 379). Dr. Stednicki responded that the vocational impact would be "loss of concentration and focus with depression . . . the person may have interruptions, unscheduled kind of interruptions in her ability to perform essential job functions" (Docket No. 10, p. 57 of 379).

C.    **MEDICAL RECORDS**

Plaintiff's medical records date back to January 22, 2009, with Plaintiff's first visit to Health Care Partners of South Carolina, Inc. ("HCP") (Docket No. 10, p. 244 of 379). Appointment notes indicate that Plaintiff described herself as having depression and COPD (Docket No. 10, p. 244 of 379). Plaintiff also admitted to smoking for the past twenty-five years (Docket No. 10, p. 244 of 379). HCP records from February 19, 2009, indicate a COPD diagnosis (Docket No. 10, p. 243 of 379).

On March 19, 2009, Plaintiff saw Dr. Mario S. Bangco, MD ("Dr. Bangco") (Docket No. 10, p. 254 of 379). Plaintiff indicated that her headaches were doing better (Docket No. 10, p. 254 of 379).

8

Dr. Bangco advised Plaintiff to engage in regular exercise, lose weight, and quit smoking (Docket No. 10, p. 254 of 379). On April 12, 2009, Plaintiff went in for an x-ray for swelling of her fourth toe on her left foot (Docket No. 10, p. 291 of 379). Scans showed no acute fracture, only osteoarthritic changes about the calcaneus and distal interphalangeal joints (Docket No. 10, p. 291 of 379). On April 30, 2009, Plaintiff went to the Conway Medical Center Emergency Room complaining of pain in her right foot after kicking a couch (Docket No. 10, p. 247 of 379). X-rays showed a proximal phalangeal fracture of the fifth toe without significant displacement or acute fracture (Docket No. 10, p. 247 of 379).

Plaintiff returned to Dr. Bangco on May 21, 2009 (Docket No. 10, p. 253 of 379). Dr. Bangco referred Plaintiff for a sleep study and advised her to engage in regular exercise and lose weight (Docket No. 10, p. 253 of 379). On July 2, 2009, Plaintiff saw Dr. Bangco still complaining of obstructive sleep apnea ("OSA")[3] and chronic headaches (Docket No. 10, p. 252 of 379). Appointment notes indicate that Plaintiff's sleep study was positive for OSA (Docket No. 10, p. 252 of 379). Plaintiff was advised to engage in regular exercise and lose weight (Docket No. 10, p. 252 of 379). She was also started on Mirapex for her RLS (Docket No. 10, p. 252 of 379).

Plaintiff underwent another sleep study on September 2, 2009, which was positive for OSA (Docket No. 10, p. 256 of 379). Study results indicated that Plaintiff did "dramatically well" with a continuous air pressure level of +13 (Docket No. 10, p. 256 of 379). Results also indicated that all upper airway resistance was eliminated with continuous air pressure (Docket No. 10, p. 256 of 379).

Plaintiff did not return to Dr. Bangco until March 5, 2010 (Docket No. 10, p. 249 of 379).

_____

[3] The temporary absence of breathing during sleep. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

Plaintiff indicated that the continuous positive airway pressure ("CPAP") device was improving her OSA symptoms (Docket No. 10, p. 249 of 379). Plaintiff also stated that she had more energy during the day and her headaches were improved (Docket No. 10, p. 249 of 379). Dr. Bangco again counseled Plaintiff to engage in regular exercise, watch her diet, lose weight, and quit smoking (Docket No. 10, p. 249 of 379).

On March 19, 2010, Plaintiff presented to the Grand Strand Regional Medical Center Emergency Room claiming to have twisted her left leg and knee and was experiencing mild pain (Docket No. 10, p. 298 of 379). X-rays showed no evidence of acute trauma, only moderate degenerative joint disease (Docket No. 10, p. 302 of 379). Plaintiff returned to Dr. Bangco on June 4, 2010, complaining of a recurring pressure headache which got worse later in the day (Docket No. 10, p. 250 of 379). Plaintiff indicated that she had occasional nausea and vomiting as well as photophobia and phonophobia (Docket No. 10, p. 250 of 379). Dr. Bangco started Plaintiff on Imitrex and advised her to engage in regular exercise, lose weight, and quit smoking (Docket No. 10, p. 250 of 379). Two weeks later, on June 16, 2010, Plaintiff returned to Dr. Bangco claiming that the Imitrex was not helping (Docket No. 10, p. 251 of 379). Plaintiff also stated that she was unable to sleep at night (Docket No. 10, p. 251 of 379). Dr. Bangco changed Plaintiff's medication to Darvocet and advised Plaintiff to engage in regular exercise and lose weight (Docket No. 10, p. 251 of 379).

Plaintiff did not return to Dr. Bangco until November 3, 2010 (Docket No. 10, p. 379 of 379). Plaintiff indicated that she was still smoking but stated that her headaches were better (Docket No. 10, p. 379 of 379). Plaintiff complained of numbness in both feet accompanied by achiness (Docket No. 10, p. 379 of 379). Dr. Bangco increased Plaintiff's dosage of Mirapex for her RLS, and advised Plaintiff to engage in regular exercise and lose weight (Docket No. 10, p. 379 of 379). On November

10

10, 2010, Plaintiff returned to HCP complaining of difficulty breathing (Docket No. 10, p. 376 of 379).

Plaintiff indicated that she was smoking a half-pack of cigarettes per day (Docket No. 10, p. 376 of 379). Plaintiff was advised to watch her diet and quit smoking (Docket No. 10, p. 376 of 379).

On January 17, 2011, Plaintiff returned to Dr. Bangco to follow up on her headaches (Docket No. 10, p. 378 of 379). Plaintiff was diagnosed with muscle tension type headaches (Docket No. 10, p. 378 of 379). Plaintiff was advised to engage in regular exercise and lose weight (Docket No. 10, p. 378 of 379). During an appointment at HCP on May 4, 2011, Plaintiff was diagnosed with hypertension, OSA, and RLS (Docket No. 10, p. 371 of 379).

**D.    EVALUATIONS**

**1.    MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS**

Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Michael Neboschick, Ph.D ("Dr. Neboschick") on May 24, 2010 (Docket No. 10, pp. 333-36 of 379). Dr. Neboschick found Plaintiff to be moderately limited in her ability to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) interact appropriately with the general public; and (3) respond appropriately to changes in the work setting (Docket No. 10, p. 334 of 379).

A second Mental Residual Functional Capacity Assessment was conducted only five months later, on October 11, 2010, by state examiner Dr. Kimberlie Brown, Ph.D ("Dr. Brown") (Docket No. 10, pp. 367-70 of 379). Dr. Brown found Plaintiff to be moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday and workweek

11

without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (5) interact appropriately with the general public (Docket No. 10, pp. 367-68 of 379).

      **2.**      **PSYCHIATRIC REVIEW TECHNIQUES**

On these same dates, Plaintiff underwent Psychiatric Review Techniques with both Dr. Neboschick and Dr. Brown (Docket No. 10, pp. 319-32, 345-57 of 379). Dr. Neboschick found that Plaintiff suffered from: (1) major depressive disorder; and (2) PTSD (Docket No. 10, pp. 319-28 of 379). With regard to "Paragraph B"[4] criteria, Dr. Neboschick reported that Plaintiff had mild restriction of her activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, or pace (Docket No. 10, p. 329 of 379). The doctor found no episodes of decompensation or evidence of "Paragraph C"[5] criteria (Docket No 10, pp. 329-30 of 379).

In her Psychiatric Review Technique, Dr. Brown found that Plaintiff suffered from: (1) major depressive disorder; (2) PTSD; and (3) anxiety (Docket No. 10, pp. 345-54 of 379). With regard to "Paragraph B" criteria, Dr. Brown reported that Plaintiff had mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, or pace (Docket No. 10, p. 355 of 379). The doctor found no episodes of decompensation or evidence of "Paragraph C" criteria (Docket No. 10, pp. 355-56 of 379).

      **3.**      **PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS**

---

[4] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[5] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

The first of Plaintiff's two Physical Residual Functional Capacity Assessments took place on May 27, 2010, with state examiner Dr. Hugh Wilson ("Dr. Wilson") (Docket No. 10, pp. 337-44 of 379). Dr. Wilson determined that Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and/or pulling (Docket No. 10, p. 338 of 379). Plaintiff could occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds (Docket No. 10, p. 339 of 379). Plaintiff should avoid concentrated exposure to extreme heat, cold, and wetness, and avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards (Docket No. 10, p. 341 of 379). She had no manipulative, visual, or communicative limitations (Docket No. 10, pp. 340-41 of 379).

On October 11, 2010, state examiner Dr. William Cain, MD ("Dr. Cain") made identical findings to those of Dr. Wilson with regard to Plaintiff's ability to lift and/or carry, stand, sit, push and/or pull, climb ramps, stairs, ladders, ropes, and scaffolds (Docket No. 10, pp. 360-61 of 379). Dr. Cain also determined that Plaintiff had no visual, manipulative, or communicative limitations, and should also avoid concentrated exposure to humidity, fumes, odors, dusts, gases, and poor ventilation and all exposure to hazards such as machinery and heights (Docket No. 10, p. 363 of 379).

###### 4.  PSYCHOLOGICAL EVALUATIONS

On May 20, 2009, at the request of the Bureau of Disability Determination ("BDD"), Plaintiff underwent a psychological evaluation with Dr. Charles W. Jackson, Ph.D ("Dr. Jackson") (Docket No. 10, pp. 234-38 of 379). Plaintiff was adequately groomed and dressed, but appeared depressed and anxious (Docket No. 10, p. 234 of 379). Plaintiff reported daily crying spells, feelings of worthlessness, hopelessness, and helplessness, and indicated that, if not for her children, she would

13

have no reason to live (Docket No. 10, p. 234 of 379). Plaintiff indicated that her typical day begins at six o'clock when she gets her children up for school (Docket No. 10, p. 236 of 379). Once her children are on the bus, Plaintiff is reportedly "up and down" until the children get home around three o'clock, when she then meets them at the bus stop, fixes them a snack, helps them with their homework, makes them dinner, bathes them, and puts them to bed (Docket No. 10, p. 236 of 379). Dr. Jackson found Plaintiff to be in the normal intelligence range with average impulse control, insight, and judgment (Docket No. 10, p. 236 of 379). Dr. Jackson also found that Plaintiff had the ability to consistently take care of her own food, shelter, personal hygiene, and other responsibilities of daily living (Docket No. 10, p. 237 of 379). Plaintiff could drive and take care of household chores (Docket No. 10, p. 247 of 379). She reportedly did not socialize due to the high crime in her neighborhood (Docket No. 10, p. 237 of 379).

Dr. Jackson also diagnosed Plaintiff with PTSD and major depressive disorder (Docket No. 10, p. 237 of 379). Plaintiff's Global Assessment of Functioning ("GAF") score was fifty (Docket No. 10, pp. 237-38 of 379).[6] Dr. Jackson opined that Plaintiff's prognosis was fair (Docket No. 10, p. 238 of 379).

Plaintiff was again evaluated by Dr. Jackson at the request of the BDD on May 13, 2010 (Docket No. 10, pp. 313-18 of 379). Plaintiff's self-reported symptoms were identical to those given during her May 2009 appointment, although Plaintiff now indicated that she had difficulty sleeping, often only sleeping two to four hours per night (Docket No. 10, p. 313 of 379). Plaintiff's level of

---

[6] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

functioning regarding her daily activities was also identical to that assessed in May 2009 (Docket No. 10, p. 316 of 379). Dr. Jackson indicated that Plaintiff did not have the ability to consistently function socially and communicate with others and reported that Plaintiff had become very socially withdrawn due to her depression and PTSD (Docket No. 10, p. 316 of 379). However, Dr. Jackson indicated that Plaintiff did have the ability to consistently and independently persist at and complete tasks in a timely manner (Docket No. 10, p. 316 of 379). Plaintiff had no difficulty in understanding, remembering, or carrying out simple instructions (Docket No. 10, p. 316 of 379).

Plaintiff was diagnosed with PTSD, major depressive disorder, and a cognitive disorder not otherwise specified (Docket No. 10, p. 316 of 379). Dr. Jackson again assigned Plaintiff a GAF score of fifty (Docket No. 10, p. 317 of 379). Dr. Jackson found Plaintiff's prognosis to be poor, given her living environment and relationship with her ex-husband (Docket No. 10, p. 317 of 379).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (citing 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI

15

claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting* SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can

16

perform.  *Colvin*, 475 F.3d at 730 (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the

Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

(citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Warren made

the following findings:

1.   Plaintiff meets the insured status requirements of the Social Security Act
     through December 31, 2013.

2.   Plaintiff has not engaged in substantial gainful activity from January 1, 2009,
     the alleged onset date.

3.   Plaintiff has the following severe impairments: pulmonary insufficiency,
     hypertension, COPD, RLS, obesity, headaches, a personality disorder, RLS,
     anxiety, and depression.

6.   Plaintiff does not have an impairment or combination of impairments that meets
     or medically equals any of the impairments listed in 20 CFR Part 404, Subpart
     P, Appendix 1.

7.   Plaintiff has the residual functional capacity to perform light work except that
     Plaintiff: (1) may only occasionally climb stairs, but no ladders; (2) may
     frequently balance, stoop, kneel, crouch, and crawl; (3) must avoid exposure to
     extreme heat/cold, wetness, humidity, fumes, dust, gases, odors, chemicals,
     hazardous machinery, and unprotected heights; (4) is capable of single,
     repetitive tasks without special supervision; (5) can attend work regularly and
     accept supervisory feedback; (6) is capable of performing simple tasks for at
     least two-hour periods of time; (7) is expected to occasionally miss a day of
     work secondary to her symptoms; and (8) is best suited for a job which does not
     require continuous interaction with the general public.

8.   Plaintiff is unable to perform any past relevant work.

9.   Plaintiff was born on March 28, 1963, and was 45 years old, which is defined as a
     younger individual age 18-49, on the alleged disability onset date.

10.     Plaintiff has at least a high school education and is able to communicate in English.

11.     Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the Plaintiff is "not disabled" whether or not the Plaintiff has transferable job skills.

12.     Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.

13.     Plaintiff has not been under a disability, as defined in the Social Security Act, at any time from January 1, 2009, the alleged onset date, through September 23, 2011, the date of the decision.

(Docket No. 10, pp. 14-24 of 379). ALJ Warren denied Plaintiff's request for DIB and SSI (Docket No. 10, p. 24 of 379).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because

18

there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.   PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges that the ALJ: (1) failed to base her determination of Plaintiff's mental residual functional capacity on substantial evidence; and (2) failed to follow the treating physician rule with regard to Plaintiff's HCP medical records (Docket No. 15).

### B.   DEFENDANT'S RESPONSE

Defendant disagrees and argues that the ALJ's determination of Plaintiff's mental residual functional capacity is supported by substantial evidence (Docket No. 15). Furthermore, Defendant maintains that the ALJ properly evaluated the medical records provided by HCP (Docket No. 15).

### C.   DISCUSSION

#### 1.     MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff alleges that the ALJ erred in her determination of Plaintiff's mental residual functional capacity by: (1) failing to account for evidence that supported Dr. Jackson's opinion; (2) wrongly relying upon Plaintiff's lack of mental health treatment; and (3) failing to properly evaluate Dr. Neboschick's opinion (Docket No. 12).

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities.

*Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

### a.    PROPER ACCOUNT OF EVIDENCE

Here, Plaintiff's mental health impairments and corresponding ability were evaluated by three examiners: Dr. Neboshick on May 24, 2010, Dr. Brown on October 11, 2010, and Dr. Jackson on May

20

20, 2009, and May 13, 2010 (Docket No. 10, pp. 234-38, 313-18, 333-36, 367-70 of 379). None of these examiners provided Plaintiff with mental health treatment, and Dr. Jackson was the only examiner to evaluate Plaintiff in person (Docket No. 10, pp. 234-38, 313-18 of 379). During his first evaluation in 2009, Dr. Jackson noted that Plaintiff lived in a bad neighborhood, a situation which was affecting Plaintiff's desire to socialize (Docket No. 10, p. 237 of 379). One year later, during his second evaluation of Plaintiff, Dr. Jackson noted that Plaintiff did not "have the ability to consistently function socially and to communicate with others without major problems arising" (Docket No. 10, p. 316 of 379).

In her decision, ALJ Warren assigned Dr. Jackson's opinion limited weight, especially with regard to Plaintiff's ability to function socially and communicate (Docket No. 10, p. 21 of 379). In assigning this weight, the ALJ cited to the fact that: (1) Plaintiff traveled with a companion everywhere she went, clearly establishing her ability to maintain relationships; and (2) Plaintiff had a cooperative attitude with Dr. Jackson during the evaluation, easily establishing and maintaining a rapport (Docket No. 10, p. 21 of 279).

Plaintiff argues that this justification is insufficient evidence to support the ALJ's discounting of Dr. Jackson's opinion (Docket No. 12, p. 8 of 19). Rather, Plaintiff alleges that Dr. Jackson's report itself offers substantial support for the conclusion that Plaintiff did not have the ability to consistently function socially or communicate (Docket No. 12, p. 9 of 19). While it is possible that the inclusion of these portions of Plaintiff's 2010 evaluation with Dr. Jackson may support Plaintiff's current theory that she is unable to consistently communicate and function socially, that argument cannot be considered by this Court. As Defendant points out, Plaintiff is asking this Court to re-weigh the evidence presented to the ALJ and make a decision, *de novo*, as to whether or not Plaintiff is capable

21

of consistent social function and communication (Docket No. 15, p. 13 of 21).

"Judicial review of the [Commissioner's] decision is limited in scope to determining whether the findings of fact made by the [Commissioner] are supported by substantial evidence and deciding whether the [Commissioner] employed the proper legal criteria in reaching her conclusion." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A federal court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id.* (*citing Myers v. Richardson*, 471 F.2d 1265 (6th Cir. 1972)). Rather, it is the *trier of fact*, which, in this case, is the ALJ, that has the obligation to resolve conflicts in the evidence. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971).

ALJ Warren weighed the evidence on consideration of the *entire* medical record. Although her list of justifications is somewhat short, it does not mean it is insufficient. Furthermore, there is ample evidence in the record to support the ALJ's decision. "In determining whether the [Commissioner's] factual findings are supported by substantial evidence, we must examine the evidence in the record *taken as a whole*." *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992) (*citing Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980)) (emphasis added).

A review of the record reveals that Plaintiff was able to leave her house for doctor's appointments numerous times during the relevant period (Docket No. 10, pp. 229-379 of 379). Plaintiff also worked as a Certified Nurse's Assistant doing nursing home and home health care for twenty-six years, a highly social profession (Docket No. 10, p. 165 of 379). It is clear that Plaintiff has some anxiety about leaving her home and moving about in her neighborhood, given a 2009 altercation and the high-crime nature of the area; however, such fears, no matter how well-founded, are not evidence of a disability that would prevent Plaintiff from working.

### b.    RELIANCE UPON LACK OF MEDICAL TREATMENT

Plaintiff makes the secondary argument that ALJ Warren also erroneously discounted Dr. Jackson's opinion by noting the fact that Plaintiff did not seek mental health treatment (Docket No. 12, pp. 10-12 of 19). While it is true that, in addition to the reasons cited above for assigning Dr. Jackson's opinion limited weight, the ALJ noted that "there is no indication that [Plaintiff] ever sought treatment from a mental health professional for any emotional issues" (Docket No. 10, p. 21 of 379), Plaintiff's argument is without merit.

To support her position, Plaintiff cites to *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009), which states that "ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White*, 572 F.3d at 283 (*citing Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)). Plaintiff argues that

> it makes no difference . . . whether or not [Plaintiff] . . . had previously sought or received mental health treatment. That the ALJ tried to use an absence of other mental health treatment as a bludgeon against the validity of Dr. Jackson's self-contained examination and report is essentially a logical fallacy in that her statement might support a finding of no severe impairment, but that same statement offers no reason to reject a well-reasoned and specific limitation of function once the ALJ had acknowledged an underlying severe impairment.

(Docket No. 12, pp. 10-11 of 19). Plaintiff cites to the fact that Plaintiff was prescribed Prozac by staff at HCP to discredit the ALJ's finding.

The evidence of Plaintiff's Prozac treatment not well-documented. Aside from self-reports, the only medical reference to the medication in Plaintiff's submitted medical record is a March 2010 questionnaire submitted to HCP by the BDD in which it appears that Plaintiff again self-reports being on Prozac (Docket No. 10, p. 295 of 379). Both the handwriting and the signature on this document are

23

illegible (Docket No. 10, p. 295 of 379). There is no indication that the form was filled out by a physician or other medical professional (Docket No. 10, p. 295 of 379). Therefore, it can hardly be considered credible evidence proving Plaintiff's pursuit of mental health treatment and is certainly not "obvious evidence of mental health treatment," as Plaintiff would have this Court believe (Docket No. 12, p. 11 of 19).

However, whether or not Plaintiff sought mental health treatment is irrelevant. In citing her reasons for discounting Dr. Jackson's opinion, ALJ Warren used more than Plaintiff's lack of mental health treatment to support her opinion, as indicated above (Docket No. 10, p. 21 of 379). Therefore, Plaintiff's allegation is without merit.

### c.  OPINIONS OF STATE EXAMINERS

In a third point, Plaintiff seems to allege that the ALJ erred by relying on the opinions of state examiners Drs. Neboschick and Brown instead of Dr. Jackson (Docket No. 12, pp. 12-15 of 19). Specifically, Plaintiff alleges that the ALJ's reliance on the state examiners' findings is misplaced because: (1) Dr. Jackson, unlike Drs. Neboshick or Brown, saw Plaintiff "repeatedly;" and (2) Dr. Neboshick failed to offer an "independent basis for a conclusion contrary to the one articulated by Dr. Jackson" (Docket No. 12, p. 13 of 19).

Unlike Dr. Jackson, who opined that Plaintiff could not consistently function socially or communicate, both Drs. Neboshick and Brown found Plaintiff to have only moderate difficulty interacting appropriately with the general public (Docket No. 10, pp. 334, 368 of 379). Furthermore, both examiners found Plaintiff to have only moderate difficulties in maintaining social functioning (Docket No. 10, pp. 329, 335 of 379). According to Plaintiff, since the examiners included and seemingly relied upon Dr. Jackson's findings, they could not have reached anything but the same

24

conclusion (Docket No. 12, pp. 12-14 of 19). This assumption is incorrect. To require state examiners to reach the same conclusion as an independent evaluator simply because the state examiners review the independent evaluator's report would defeat entirely the purpose of having a claimant evaluated by the state examiners.

Plaintiff relies upon an unpublished Sixth Circuit case, *Rose Dragon v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 454 (6th Cir. 2012), to argue that Dr. Jackson's opinion must be given more weight than the opinion of either Dr. Neboshick or Dr. Brown (Docket No. 12, p. 7 of 19). Plaintiff quotes *Rose Dragon*, stating, "in weighing medical opinions, generally, a treating source is to be given more weight than an examining source and an examining source [] more weight than a non-examining source" (Docket No. 12, p. 7 of 19). What Plaintiff fails to mention is the rest of the Sixth Circuit's decision, which states that "this is not a bright-line rule." *Rose Dragon*, 470 Fed.Appx. at 463.

Plaintiff also alleges that the ALJ failed to set forth any evidentiary basis for assigning "great" weight to the opinions of Drs. Neboshick and Brown (Docket No. 12, pp. 12-15 of 19). Although it is true that ALJ Warren assigned the opinions of both Dr. Neboshick and Dr. Brown great weight without giving a detailed explanation as to why, such an explanation is unnecessary. Under the regulations, the Commissioner will evaluate every medical opinion he receives, regardless of its source. 20 C.F.R. § 404.1527(c). "In order to determine whether the ALJ acted properly in disagreeing with a medical source, we must first determine the medical source's classification." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). There are three types of medical sources: non-examining sources, non-treating (but examining) sources, and treating sources. *Id*. "The Social Security Administrative gives the most weight to opinions from a claimant's treating source; accordingly, an ALJ is procedurally required to give good reasons in [its] notice of determination or decision for the weight [it gives the

claimant's] treating source's opinion. However, this requirement only applies to *treating* sources." *Id*. (*citing Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875-76 (6th Cir. 2007)) (emphasis in original). In *Smith*, the Sixth Circuit noted that "claimants are entitled to receive good reasons for the weight accorded their *treating* sources independent of their substantive right to receive disability benefits." *Smith*, 482 F.3d at 875 (emphasis added). The Court further went on to state that " . . . this reasons-giving requirement exists only for § 404.1527(d)(2), and not for the remainder of § 407.1527(d) . . . Yet even if the purpose of the reasons-giving requirement in § 404.1527(d)(2) applies to the entire regulation, the SSA requires ALJs to give reasons for only *treating* sources." *Id*. at 876 (emphasis in original).

Here, both Drs. Neboschick and Brown were non-examining sources. As such, while ALJ Warren was indeed required to consider their opinions and evaluate them in light of the balance of the medical record, the ALJ was *not* required to provide "good reasons" for accepting or discrediting these opinions.

Therefore, Plaintiff's first assignment of error is without merit and the Magistrate recommends that the decision of the Commissioner be affirmed.

## 2.    MEDICAL SOURCE RECORDS FROM HCP

In her second assignment of error, Plaintiff alleges that the ALJ relied on, but failed to assign weight to, a March 10, 2010, worksheet completed by someone at HCP (Docket No. 12, pp. 15-19 of 19). According to Plaintiff, in order for the ALJ to rely on the information contained in this worksheet, the ALJ was required to state what weight she assigned the opinion (Docket No. 12, p. 17 of 19). Given the nature of the opinion, this is incorrect.

It is well established in the Sixth Circuit that an "ALJ must give a treating source opinion

26

controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009) (*citing Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). However, controlling weight cannot be assigned unless the ALJ first finds the source to be a "treating physician." *Blakley*, 581 F.3d at 407. When a source is *not* a treating physician, an ALJ may still use the evidence to evaluate the severity of a claimant's impairments, but no formal analysis is required. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d).

Here, Plaintiff seems to assign this unknown provider treating physician status. According to Plaintiff, "though unnamed throughout the record, this *treating source* was best situated to address [Plaintiff's] mental health limitations by virtue of repeated contact and actual medical decision-making in the form of medication management" (Docket No. 12, p. 17 of 19) (emphasis added). There is no possible way to assign "treating physician" status to the doctor who completed this March 10, 2010, worksheet. First and foremost, given the illegibility of the signature on this document, there is no way to determine if this worksheet was even completed by a physician or other acceptable medical source (Docket No. 10, p. 295 of 379). Plaintiff herself acknowledged this difficulty (Docket No. 12, p. 16 of 19). Even if this alleged physician *was* Plaintiff's treating source, it is unlikely that he or she treated Plaintiff for any mental impairments. All of Plaintiff's other medical records from HCP concern her hypertension and COPD (Docket No. 10, pp. 243, 244, 371, 376 of 379). Furthermore, the examiner offers no support for his opinion that Plaintiff suffered from a slowed thought process, depressed mood, or poor attention and concentration (Docket No. 10, p. 295 of 379).

ALJ Warren cited this report twice in her decision, noting that Plaintiff was "oriented in all

27

spheres with poor attention/concentration, but adequate memory" (Docket No. 10, pp. 18, 22 of 379).

Plaintiff is correct in that the ALJ used information from this report to help evaluate Plaintiff's mental

residual functional capacity (Docket No. 12, pp. 15-19 of 19). However, it is clear from the ALJ's

opinion that this was not the only evidence she relied upon to make her decision. In fact, as Plaintiff

fails to point out, Dr. Jackson reached these same conclusions during both of his evaluations (Docket

No. 10, pp. 236, 315 of 379). ALJ Warren was not required to assign weight to this opinion evidence.

Plaintiff's second assignment of error is without merit and this Magistrate recommends that the

decision of the Commissioner be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner

be affirmed.


   s/ Vernelis K. Armstrong     
VERNELIS K. ARMSTRONG
UNITED STATES MAGISTRATE JUDGE


Date:   April 25, 2013

28

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the Local Rules for Northern District of Ohio, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in United States v. Walters, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In Thomas v. Arn, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.